

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

             Plaintiff,

v.

Jeffrey A. Royer,

             Defendant.
_____/

Case: 2:24-cr-20565
Assigned To : Goldsmith, Mark A.
Referral Judge: Grand, David R.
Assign. Date : 10/3/2024
Description: IND USA V SEALED MATTER (MRS)

Violations:
18 U.S.C. § 1348
18 U.S.C. § 1343

## **INDICTMENT**

THE GRAND JURY CHARGES:

### General Allegations

At all times relevant to this Indictment:

1.     The defendant, Jeffrey A. Royer, was a resident of Colorado.

2.     Royer was not registered with the United States Commodity Futures Trading Commission ("CFTC") in any capacity.

3.     In 2005, Royer was convicted of federal securities fraud, among other charges. He was released from federal prison in 2012 after completing his sentence of imprisonment.

4.     Royer used a Gmail email address ("Royer's Gmail account") to send emails to, and receive emails from, investors, including some investors in the Eastern

1

District of Michigan. Gmail is an email service offered through Google, LLC, whose servers are located outside of Michigan and Colorado.

5. Transfers of some investment funds from investors, including some investors in the Eastern District of Michigan, to Royer's accounts involved the transmission of wire communications in interstate commerce, such as through the Fedwire system ("Fedwire") and/or the Clearing House Interbank Payment System ("CHIPS"), which are domestic funds-transfer systems.

<u>Overview of Scheme to Defraud</u>

6. Beginning in 2020 and continuing through in or about June 2023, Royer participated in an investment fraud scheme involving his personal retail foreign-currency exchange ("forex") trading account.

7. In the course of the scheme, Royer held himself out as an accomplished forex trader and convinced investors in the Eastern District of Michigan and elsewhere to invest money with him in his forex trading account, which he represented he would use for forex trading to generate investment returns for investors. In the course of the scheme, Royer generated and sent to investors fictitious monthly account statements showing that their investments were earning positive returns month after month, and he encouraged investors to tell others about investing with him.

2

8.  In truth and in fact, Royer was not an accomplished forex trader, his trading was generally unsuccessful, and the trading results Royer provided to investors were false and did not reflect the trading losses actually incurred by Royer. Further, Royer did not invest all investor funds as he had represented, and in addition, he used investor funds to cover personal expenses, which he did not disclose.

9.  In or around June 2023, Royer emailed investors that their money was gone. He did not tell investors that he had in fact stopped trading several months earlier after depleting all but a few dollars in the account.

## The Scheme to Defraud

10. Beginning in or around February 2020 through at least June 2023, Royer engaged in a scheme to defraud investors and obtain money by means of false and fraudulent pretenses, representations, promise, and material omissions.

11. As part of the scheme, Royer had a personal forex trading account that he operated. Royer opened that account in or around September 2019 and began trading in that account in or around December 2019. No later than February 2020, Royer began soliciting investors to invest in the account. A number of those who Royer solicited and who invested in the forex account had little to no experience trading forex or other financial instruments.

3

12. It was part of the scheme that Royer told investors that he would pool investor funds with his own money in the forex account and use the funds for forex trading to generate investment returns. To induce investors, Royer told investors that his goal was to generate investment returns of ten percent per month for investors and that he would only keep returns above ten percent for himself.

13. As part of the scheme, Royer solicited investors through direct, person-to-person solicitations and referrals from other investors. For example, B.T., a resident of the Eastern District of Michigan, was one of the investors who Royer solicited. B.T. in turn referred other investors, including but not limited to E.H. and S.H., who are residents of the Eastern District of Michigan. The names of B.T., E.H., and S.H. are known to the Grand Jury.

14. As part of the scheme, Royer held in-person meetings in the Eastern District of Michigan with investors and potential investors during which he solicited investment in his forex account, promoted its purported profitability, and encouraged investors to tell others about it.

  a. In or around February 2020, Royer sent an email to investors and potential investors stating that he was looking to set up a meeting with people who had "an itch" to get their lives "bumped to another level financially." Following that email, in or around March 2020, Royer met with investors and potential investors in

4

                the Eastern District of Michigan at the home of H.S., an investor whose name is known to the Grand Jury, where he solicited investment for his forex account.

        b.      Approximately a year later, in or around April 2021, Royer held an in-person meeting with investors and potential investors at a union hall in Livonia, Michigan. During that meeting, Royer solicited investment funds for his forex account and encouraged those present to tell others about investing with him.

        c.      About another year later, Royer returned to the Eastern District of Michigan and held another in-person investment meeting at a cabin in Clarkston, Michigan, in or around May 2022, where he again solicited investment funds for his forex account and encouraged those present to tell others about investing with him.

15.    It was part of the scheme that Royer made misrepresentations and material omissions about his background to induce the trust of investors and potential investors, including, but not limited to, holding himself out as an accomplished forex trader while omitting that he was not registered with the CFTC in any capacity, and that he had previously been convicted of federal securities fraud.

16. It was part of the scheme that Royer made misrepresentations and material omissions about how investors' money would be held and invested, including, but not limited to, the following:

    a. Royer represented that investors' money would be held in his forex account, would be pooled with other investors' funds, and would be used for forex trading to generate investment returns, when in fact some investors' money was not transferred to his forex account from his personal bank or financial accounts.

    b. Royer never told investors that some investor funds would not be transferred into the forex account from his personal bank or financial accounts.

    c. Royer used investor funds in his personal bank or financial accounts to cover personal expenditures. Royer never told investors that he would use investor funds for anything other than forex trading to generate investment returns in the forex account.

17. As part of the scheme, Royer misrepresented and omitted material information regarding investment risks and profit potential, including but not limited to, the following:

a. Royer led investors to believe that he had traded forex successfully for himself and other investors. But Royer frequently lost funds on a monthly basis trading forex, which he did not disclose to investors.

b. Royer continuously promoted a return goal of ten percent per month with compound interest even though he seldom achieved that ten percent monthly return goal and frequently lost money trading on monthly basis.

c. Royer did not tell investors that he had suffered any monthly trading losses.

d. Royer misled investors about the safety of their investment principal. He led investors to believe that he was trading on investment profits, and that if he needed to use investor principal for trading, he would be able to reimburse investors using his own funds, which turned out to be false.

e. Royer misrepresented that investors would be able to make withdrawals as needed, which turned out to be false.

18. As part of the scheme, Royer made misrepresentations and material omissions about his trading performance with investment funds in the forex account, including but not limited to, the following:

    a. The investor account balances Royer sent to investors in 2020 did not accurately reflect the state of the investors' accounts. Royer reported monthly gains in investor account balances and did not report any monthly losses. In truth, Royer's trading results with funds in the forex account were negative in 2020, that is, he lost money in 2020, and he lost money in a majority of the months in 2020.

    b. The investor account balances Royer sent to investors in 2021 did not accurately reflect the state of the investors' accounts. Royer never reported a monthly loss to investors from trading in 2021. But Royer lost money in a majority of months in 2021.

    c. The investor account balances Royer sent to investors in 2022 did not accurately reflect the state of the investors' accounts. Royer never reported a monthly loss to investors from trading in 2022. But he lost money in a majority of the months in 2022.

19. It was part of the scheme that Royer concealed the truth to encourage additional investment and lull investors into maintaining their investments. These concealments included, but were not limited to, the following:

    a. Royer generated end-of-month monthly account balance statement for his investors, purportedly showing the value of the

investor's account at the end of the month, the opening value of the account for the next month, and sometimes the rate of return for the month that just ended. Little if any of the account balance information was true as Royer had not invested all the investors' money in the account and most months of trading resulted in losses. On the basis of the supposed positive returns in the monthly statements, some investors made additional investments with Royer.

b. Royer described the investment arrangement as informal which he used to justify limiting the information he shared with investors, which in turn made it more difficult for investors to request, receive, or review an accounting of the trades made with their money or evaluate his actual trading performance.

c. Royer caused transfers to be made to investors who wished to withdraw funds from their account, which caused investors to believe their investment was safe and profitable.

d. In or around August 2022, Royer told investors that they would need to adjust their withdrawals amounts but did not disclose that he had suffer any trading losses. In or around October 2022, he blamed his trading platform for a hold on withdrawals.

    e.    Royer continued to misrepresent that the platform was to blame for the hold on withdrawals in November 2022 through at least March 2023, while omitting that he continued to suffer trading losses in November and December 2022. By the end of December 2022, less than approximately five dollars was left in the forex account.

    f.    Royer continued to mislead investors about the status of their investment funds from on or about January 2023 through on or about May 2023. Royer omitted telling investors that he had stopped trading in the account in or around the end of December 2022 and misled investors to believe their money was still in the account by assuring them that their account balances were unaffected by the purported hold on withdrawals.

20.    In furtherance of the scheme, on or about June 2023, Royer told investors their money was gone, claiming he lost it in forex trading. In the months that followed, Royer claimed he planned to make investors whole, but he never did. Royer did not tell investors that he had not transferred all investor funds into the forex account, that he had not invested all investor funds as he had told investors he would, that is, in forex trading, and that he used investor funds for personal use.

Purpose of the Scheme

21. The purpose of the scheme was for Royer to obtain money from investors so as to unlawfully enrich himself; lull investors into maintaining their investments, make additional investments, and encourage others to invest; and support an expanding scheme.

## COUNT ONE
## 18 U.S.C. § 1348
*Commodities Fraud*

22. Paragraphs 1 through 21 of this Indictment are realleged and incorporated as if fully set forth here.

23. Beginning in or about February 2020 and continuing through about June 2023, both dates being approximate and inclusive, in the Eastern District of Michigan and elsewhere, the defendant, Jeffrey A. Royer, knowingly and with intent to defraud, executed and attempted to execute a scheme and artifice (a) to defraud persons in connection with a commodity for future delivery, that is a foreign currency future; and (b) to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of a commodities for future delivery, that is a foreign currency future.

All in violation of Title 18, United States Code, Section 1348.

11

**COUNT TWO**
**18 U.S.C. § 1343**
*Wire Fraud*

24.  Paragraphs 1 through 21 of this Indictment are realleged and incorporated as if fully set forth here.

25.  From in or about February 2020 through in or about 2023, both dates being approximate and inclusive, in the Eastern District of Michigan and elsewhere, the defendant, Jeffrey Royer, knowingly devised and intended to devise a scheme and artifice to defraud investors and to obtain money and property from them by means of materially false pretenses, representations, and promises. For the purpose of executing and attempting to execute the scheme and artifice to defraud, defendant Jeffrey Royer, transmitted and caused to be transmitted in interstate commerce, by means of wire communication, certain writings, signs, and signals, to wit: electronic transfers of investor funds, and false and misleading email communications to investors concerning, among other things, the performance of their investment funds and the manner in which investor funds were utilized.

All in violation of Title 18, United States Code, Section 1343.

**FORFEITURE ALLEGATIONS**

26.  The allegations contained in this Indictment are realleged and incorporated by reference to allege forfeiture under Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

12

27. Upon being convicted of the offense in violation of Title 18, United States Code, Section 1348, the defendant shall forfeit to the United States, under Title 18, United States Code, Section 981(a)(1)(C), together with Title 28, United States Code, Section 2461, any property, which constitutes, or is derived from, proceeds obtained directly or indirectly as a result of such violation.

28. Upon being convicted of the offense in violation of Title 18, United States Code, Section 1343, the defendant shall forfeit to the United States, under Title 18, United States Code, Section 981(a)(1)(C), together with Title 28, United States Code, Section 2461, any property, which constitutes, or is derived from, proceeds obtained directly or indirectly as a result of such violation.

29. The forfeiture in this case may include entry of a forfeiture money judgment in an amount up to the value of the property subject to forfeiture for the violation(s) of conviction.

30. If, by any act of omission of the defendant, the proceeds of the offenses: cannot be located upon the exercise of due diligence, have been transferred, sold to, or deposited with a third party, have been placed beyond the jurisdiction of the court, have been substantially diminished in value, or have been commingled with other property which cannot be divided without difficulty, the United States of America shall seek to forfeit substitute property under Title 21, United States Code, Section

853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

THIS IS A TRUE BILL

*s/GRAND JURY FOREPERSON*
GRAND JURY FOREPERSON

DAWN N. ISON
United States Attorney

*s/Mark Chasteen*
Mark Chasteen
Chief, White Collar Crime Unit

*s/Trevor M. Broad*
Trevor M. Broad
Assistant United States Attorney

Dated: October 3, 2024

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cover Sheet** | Case Number<br>24-cr-20565 |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

| **Companion Case Information** | **Companion Case Number:** |
|---|---|
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | Judge Assigned: |
| ☐ Yes    ☒ No | AUSA's Initials: TMB |

Case Title: USA v. Jeffrey Royer

County where offense occurred: Wayne, Oakland and elsewhere

Check One:    ☒ Felony        ☐ Misdemeanor        ☐ Petty

   ✓ Indictment/____ Information --- **no** prior complaint.
   ____ Indictment/____ Information --- based upon prior complaint [Case number:                    ]
   ____ Indictment/____ Information --- based upon LCrR 57.10 (d) *[Complete Superseding section below]*.

**Superseding Case Information**

**Superseding to Case No:** _____    **Judge:** _____

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|

Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.

October 2, 2024
      Date

s/Trevor M. Broad
Trevor M. Broad
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226-3277
Phone: (313) 226-0210
Fax:    (313) 226-2873
E-Mail address: trevor.broad@usdoj.gov
Attorney Bar #:

---

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.